# Central Market Company, Appellant, *v.* City of Erie.

*Municipalities—Police power—Markets—Regulation of markets—Ordinances.*

1. An ordinance of a municipality forbidding any person "to purchase or sell within or about any market or market places in the city, any fruit, butter . . . . or other provisions for the purpose of selling the same," and imposing a money penalty for a violation of the ordinance, is an invalid exercise of the police power, and cannot be enforced.

2. Where a municipality undertakes to enact an ordinance restricting the natural rights of its citizens to buy and sell commodities at such time, places, and under such terms as they may elect, such regulations must find a justification in some public necessity, such as the preservation of the public health, the protection of public morals, the promotion of easy traffic along the highways, etc.

Submitted April 11, 1910.   Appeal, No. 152, April T., 1910, by plaintiffs, from decree of C. P. Erie Co., Feb. T., 1909, No. 8, dismissing bill in equity in case of Central Market Company, F. M. Feasler and John E. Zeiser v. City of Erie.   Before RICE, P. J., HENDERSON, MORRISON, ORLADY, HEAD, BEAVER and PORTER, JJ.   Reversed.

Bill in equity for an injunction.

The facts are stated in the opinion of the Superior Court.

*Error assigned* was decree dismissing the bill.

*Frank Gunnison, John R. Rilling* and *Henry E. Fish,* for appellant.—We contend that the ordinance is not a reasonable exercise either of the police power of the city, or of the power conferred by sec. 33 of the Act of May 23, 1889, P. L. 291, "to provide and enforce suitable general market regulations:" Twelfth Street Market Co. v. R. R. Co., 142 Pa. 580; Wartman v. Phila., 33 Pa. 202; Mt. Carmel v. Fisher, 21 Pa. Superior Ct. 643; Barton v. Morris, 10 Phila. 360.

*Charles P. Hewes,* for appellee.—The ordinance in suit is intended to prevent forestalling the market; to confine the business to retail to prevent the buying up of food and provisions by middle men and hucksters, at the market houses, and then raising the prices to the consumers. Its purpose is not to restrain trade: Mayor of Philadephia v. Davis, 6 W. & S. 269.

By the common law of Pennsylvania every municipal corporation having the power to make by-laws and establish ordinances to promote the general welfare and preserve the peace of a town or city may fix the time and place of holding public markets for the sale of food, regulate the same and shift them from place to place as the public convenience demands: Mayor of Phila. v. Davis, 6 W. & S. 269; Wartman v. Phila., 33 Pa. 202;

Denehey v. Harrisburg, 2 Pears. 330; Strickland v. Penna. R. R. Co., 154 Pa. 348; Hughes v. Farmers' Assn., 1 Phila. 338.

A city ordinance is not unconstitutional and void because it forbids any person to purchase within a market, during market hours, any fruit, butter, eggs, vegetables, or other provisions for the purpose of selling the same: Meadville v. Miller, 29 Pa. C. C. Rep. 517.

OPINION BY HEAD, J., October 10, 1910:

Central Market Company, one of the plaintiffs, is a corporation created under the general act of 1874. It has owned for many years a valuable piece of land in the city of Erie. Under a contract with the city, made in 1893, it erected and equipped a building suitable for a market house, and since that date, under the terms of said contract, there has been maintained therein a public market. The plaintiff company has been permitted to exercise and enjoy the rights conferred upon it by that contract, and the city without complaint has exercised and continues to exercise in relation to said market "such powers as would include supervision for purposes of cleanliness, ventilation, inspection of the quality of the articles sold, and the weights and measures employed in making sales."

F. M. Feasler, another plaintiff, is and has been for a long time a lessee of one or more stalls in said market house where he conducts the business of selling marketable provisions, some of which are produced by himself and some of which he purchases. John E. Zeiser, the remaining plaintiff, is a retail grocer in the said city engaged in the sale of like provisions which he buys where he can buy to the best advantage, including the market referred to.

In January, 1908, the city adopted an ordinance, sec. 1 of which provides, "It shall be unlawful for any person or persons to purchase or sell within or about any market or market places in the city of Erie, any fruit, butter, . . . .

or other provisions for the purpose of selling the same." Section 2 provides, "Any person or persons violating the provisions of this ordinance shall suffer a penalty of $25.00 for each offense." The plaintiffs then filed this bill setting forth the facts already adverted to and many others tending to show that their respective investments and business would be greatly injured, if not destroyed, by the enforcement of such ordinance, and that no public interest would be subserved thereby; that the ordinance was arbitrary, unreasonable and oppressive, and they therefore prayed for an injunction to restrain the city and its officers from enforcing the same. A preliminary injunction was awarded. The city, making no answer and setting up no facts, filed a general demurrer to the bill and the cause came on for final hearing on bill and demurrer. After argument the learned judge below sustained the demurrer, dissolved the preliminary injunction and dismissed the bill, and the plaintiffs appeal.

Although the plaintiff company was organized for the purpose of conducting a market, and actually does conduct one in the manner already recited, it remains simply a private corporation: Twelfth Street Market Company v. Railroad Company, 142 Pa. 580; Strickland v. Penna. R. R. Co., 154 Pa. 348.

But if this be true, it is none the less true that the business of conducting a market, whether carried on by a corporation, unincorporated association, or even a private citizen, is, within proper limitations, subject to the supervision and control of the police power of the municipality in which the market is maintained. This has been so long and so universally recognized that even to cite the decisions in this country and England affirming it would be but a useless parade of learning easily accessible to anyone interested.

The present plaintiffs, not denying the right of the city to make proper regulations as to the conduct of the market, and not contending that the general police power vested in the city of Erie has been diminished or restricted

by the terms of a contract made by a city council many years ago, earnestly insist, however, that such power can be lawfully exercised only to secure or protect the common public health, morals, safety or welfare, and that any exercise of it where no such necessity appears is arbitrary and unreasonable. This contention raises the single issue presented by this record.

The question whether or not any given exercise of power by a municipality falls fairly within the scope of what is known as its police power has always been considered a judicial question. Our courts, however, whilst determining in each case as it arose whether the ordinance or regulation complained of was or was not a valid exercise of such power, have been necessarily reluctant to attempt to define in general terms the limitations of that power. We say necessarily because the police power of a state is, in essence and substance, but the inherent right of every organization that has life to repel attacks hurtful to or destructive of it. In nature every form of organized life is subject to such attacks, and its continued existence must necessarily depend on its ability to successfully resist them. The modes in which this resisting power can be most effectively exercised must necessarily be as varied as the attacks which impel its exercise, and these constantly change with the changing conditions of the organized life affected. In this respect the civic organization we call a state is subject to the same varying and hurtful attacks, and as a consequence the exact limitations of its power of defense and the manner of its exercise cannot well be at any time measured by fixed rules or confined within designated boundaries.

But a municipality cannot finally determine for itself the extent to which and the conditions under which this power may be rightfully exercised any more than an individual can finally decide for himself that his act in killing or seriously wounding another in his own defense was justifiable although the abstract right of self-defense be fully conceded.

When therefore a municipality undertakes to enact an ordinance restricting the natural right of its citizens to buy and sell commodities at such times, places, and under such terms as they may elect, such regulations must find their justification in some public necessity such as the preservation of the public health, the protection of public morals, the promotion of easy traffic along the public highways, etc. An examination of the numerous cases in our own and other states shows that wherever such ordinances have been sustained by our courts of last resort the decisions have rested on the principle indicated. The preservation of the public health, for instance, requires that articles of food sold to the citizens of a community be sound and wholesome. This begets the right and duty of public inspection, and, in order that such inspection may be performed effectively and with reasonable convenience, the city may designate the places where such provisions may be sold and prohibit their sale at other places: State of Louisiana v. Sarradat, 24 L. R. A. 584 (46 La. 700). For the same reason regulations establishing sanitary conditions in and about the places where such food is sold have been sustained. The public right to have the streets of a municipality kept open and free from obstruction for general travel furnishes satisfactory ground for sustaining an ordinance limiting the days and hours when curbstone markets may be held in a borough: Mt. Carmel Borough v. Fisher, 21 Pa. Superior Ct. 643.

And generally, the extent to which police regulations concerning markets have been heretofore sustained is fairly described in the following language quoted from the opinion of Mr. Justice WILLIAMS in Strickland v. Penna. R. R. Co., 154 Pa. 348: "The right to regulate the markets includes a general supervision for purposes of cleanliness and ventilation, for the inspection of the quality of the articles sold, and the weights and measures employed in making sales. The municipality may require diseased or unwholesome articles to be removed, and enforce such

regulations as seem desirable for the protection of the public health. The essential elements of a market are summarized in 14 Am. & Eng. Ency. of Law, 466. They are as follows: (1) A place where sales may be made to the public. (2) The necessary and convenient fixtures for the business of weighing, dividing, measuring, and selling. (3) A system of police regulations fixing market days, or hours, providing for the lighting, cleaning, and watching of the market, and for testing and correcting the weights, measures and qualities of things sold. (4) Market officers authorized to enforce such police regulations for the protection of both buyers and sellers."

In no case that we have examined have police regulations any broader than the language above quoted been sustained by the courts. In the present case the ordinance of 1893 and the contract following it expressly reserved to the city the right to use its supervisory police power to the full extent of the language we have quoted. There is no complaint on the part of these plaintiffs concerning that contract and no denial of the right of the city to fully exercise its police power to that extent; and the plaintiffs go farther and agree that if a public necessity should arise for police regulation of the market that would go beyond the powers expressly reserved in the contract, such power could be lawfully exercised because it would not be competent for one city council to enter into a contract, the effect of which would be to abridge the police power delegated by the state to the city as one of its municipal agents.

The ordinance complained of, however, in our opinion goes far beyond the limitations mentioned and beyond any that have been sustained by our courts of last resort. It provides that it shall be unlawful to purchase or sell provisions within or about the market place "for the purpose of selling the same." There is no qualification as to character, time, manner or extent of the sales forbidden except that contained in the words quoted. It is easy enough to see that one who buys may have the

"purpose" or intention of selling what he has bought; but it requires some effort to understand how he who sells goods in the market can have either "purpose" or intention of selling them again.  These words aptly describe the mental attitude of a man towards his own conduct or actions in the future; not towards those of another which he cannot control.

It is true the plaintiff, Feasler, when he made a sale from his stall might have the expectation or belief, founded on observation or information, that his vendee purposed or intended to sell the goods he had just bought. But it requires a liberal interpretation of a penal statute to impute to the "purpose" or intention of Feasler the act of another that he neither solicited nor induced, in which he had no interest and over which he had no control.

When the farmer comes regularly with the products of his vegetable or poultry farm and sells them to the stall owners in the market he certainly sells them within or about the market place.  He has every reason to expect and believe they will be sold again.  Are such sales forbidden by this ordinance?  If so, how are the stalls to be supplied with the provisions the consumers expect to find there?  Other illustrations showing the useless hardships that would result to the plaintiff referred to and others like him will readily occur.

The other plaintiff is a grocer in some distant part of the city, how far from the market house the record does not disclose.  His business exists because his patrons in his neighborhood find it to their convenience or advantage to buy from him.  He in turn has the natural right to buy the fruit, vegetables, etc., that his patrons require where he can buy to the best advantage.  If he can buy some from one stall in the market, some from another, and his patrons prefer to accept his selections brought to their immediate vicinity, rather than expend the time and trouble necessary to go to market and select for themselves, in what way is the public injured thereby?

As we have said, the city has chosen to demur to the plaintiffs' bill and brings upon the record no facts from which we can perceive that this ordinance is founded on any public necessity or requirement whatever. That its enforcement would seriously injure the plaintiffs cannot we think be doubted. When the record then is barren of anything upon which we could rest a conclusion that such an interference with the business and property of private citizens is necessary to preserve the public health, to promote the public welfare, to uphold the public morals, to keep the highways open or prevent a breach of the peace, we are unable to find any justification for an ordinance of such a drastic character.

We are not to be understood as holding that because no case has yet been decided where such an exercise of police power as is here complained of has been sustained that such power has reached the limits within which it may be rightfully exercised. We have no intention of attempting to say that conditions might not arise which might require an even more stringent exercise of the state's police power than any that have yet been recognized or approved. We only hold that as the record in the present case is made up we are unable to find within it anything to justify this ordinance, which without the foundation of a public necessity seems to us to be oppressive, unnecessary and unreasonable.

The learned court below should therefore have overruled the demurrer and required the defendants to answer or have the bill taken pro confesso. We do not understand there is any issue of fact between the parties but rule 36 prescribes the procedure to reach a final decree.

The decree is reversed, the bill and injunction are reinstated and the record is remitted with direction to proceed as required by rule 36, equity rules. The costs of this appeal to be paid by appellee.

HENDERSON, J., dissents.